IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

UNITED STATES OF AMERICA,

          Plaintiff,

vs.

KARRE CHRISTINE O'DELL,

          Defendant.

8:22CR36

FINDINGS AND
RECOMMENDATION

      This matter is before the Court on the Motion to Suppress (Filing No. 29) filed by Defendant, Karre Christine O'Dell.  Defendant filed a brief (Filing No. 30) in support of the motion and the government filed a brief (Filing No. 35) in opposition.

      The Court held a pre-hearing status conference with counsel on July 7, 2022, and held an evidentiary hearing on the motion on August 16, 2022.  Defendant was present with her attorney, Karen Shanahan.  The government was represented by Assistant United States Attorney, Sean Lynch.  The Court received into evidence, without objection, the government's Exhibits 1-3 containing the body camera footage for each of the three Omaha Police Department ("OPD") Officers involved with the events at issue, and Exhibit 4, which is a thumb drive consolidating Exhibits 1-3.  No witnesses were called to testify at the hearing.  A transcript (TR.) of the hearing was prepared and filed on August 28, 2022.  (Filing No. 45).  This matter is now fully submitted to the Court.  For the following reasons, the undersigned magistrate judge recommends that Defendant's motion be denied.

## BACKGROUND

      Shortly after 10:00 a.m. on October 15, 2021, the manager of the Cambria Hotel in Omaha, Nebraska contacted police to report a theft at the hotel.  OPD officers Martin, Hanzek, and Chalupa responded to the call.[1]  The hotel manager met with the officers in the hotel lobby at approximately 10:25 a.m. and explained that a hotel guest had accidentally left his wallet on the counter of the hotel's front desk; when the manager reviewed video surveillance of the front desk, he saw a woman he recognized as a frequent hotel guest (later identified as Defendant)

---

[1] Officer Martin's body-cam footage is contained in Exhibit 1; Officer Hanzek's body-cam footage is contained in Exhibit 2; and Officer Chalupa's body-cam footage is contained in Exhibit 3. (TR. 10).

taking the wallet from the counter when she was checking in a couple hours later. The manager led the officers from the lobby to the back office and played the surveillance video depicting a woman taking the wallet off the front desk. The manager told officers he knew the woman and had her information, and wanted her "banned and barred from this property." The manager noted that the woman had stayed at the hotel several times, "she kind of looks like she's on drugs," and he did not want her back. The manager stated the woman had booked her stay online beginning October 13 and was set to check out October 16. The manager stated the hotel has had "problems" with the woman in the past, and thinks he remembers her because the last time she was there her card had been declined. The manager stated he had "ban and bar paperwork" and asked officers to escort the woman off the property. (Ex. 2 - Hanzek 1 at 3:28-6:52). The manager advised that the woman, whom he believed was named "Cynthia Wenninghoff," was registered to rooms 409 and 413, and that he could let officers into her room. (*Id.* at 6:52-8:46).

The manager led officers to room 413. Officer Hanzek knocked on the door and the manager announced, "hotel management." The manager then knocked on the door and told officers he heard someone say "what" inside the room. The manager knocked once more and again announced, "hotel management." When no one came to the door, the manager used an electronic key fob to unlock and open the door, announcing "hotel management" into the room. A half-dressed man came to the door and told them to "hold on a second." The manager stepped aside and Officer Hanzek placed his hand on the door and foot in the doorway to prevent the door from closing and stated, "we're not shutting the door." Officer Hanzek and Officer Martin then entered the room, followed by Officer Chalupa and the manager. (*Id.* at 9:30-11:53; Ex. 3 - Chalupa 1 at 11:52-12:00). A half-dressed woman sitting on the bed inside the room asked, "What's going on?" Officers addressed the woman as Cynthia, and she said "no;" officers asked if she was Cynthia and the woman replied she was not Cynthia. Officers asked, "where is Cynthia?" and the manager clarified, "that's her, if that's not her real name. That's her." The woman stated she had checked into the hotel, but she was not Cynthia. (Ex. 1 - Martin 1 at 9:15-9:35).

Officer Hanzek told the woman that the officers were there because they had her on video taking a gentleman's wallet off the front counter, and they wanted the wallet back. Officer Martin stated, "It could go easy" for her if she gave them the wallet, she would be banned and barred, and the officers "would be gone." The woman stated she threw the wallet in the trash

2

outside of the hotel. Officers asked for identification from both the man and the woman. The woman stated she did not have an I.D. and told officers her name was Karre O'Dell (Defendant), and that Cynthia was a friend that paid for the room. Officer Hanzek picked up a wallet that was on a table next to the man, who identified himself as Lucas Rief, and began searching its contents. The wallet contained numerous gift cards and cards bearing the names of other people. Officer Hanzek also began searching Defendant's purse and other bags and personal effects in the room, finding several phones, items addressed to different people, and a rental agreement for a car in Defendant's son's name.

Officers continued to search through the contents of the room for a few minutes, at which point Officer Martin looked at the table next to where Lucas was sitting and stated, "they've been freebasing in here." Officer Martin asked, "whose is this?" and "is it meth?" Lucas replied, "yes." Officers handcuffed Lucas and Defendant. Body cam footage shows a large blue glass pipe, bubble wrap, a white dish, and a white baggie sitting on a table next to Lucas. (Ex. 2 - Hanzek 1 at 12:15-21:56). Officers continued to search the contents of the room and occasionally directed questions to Defendant and Lucas. In a bag on the table by the suspected drug paraphernalia, Officer Hanzek recovered the wallet and the identification card from the guest who had reported it stolen. (*Id.* at 22:30-23:30). Officers continued to search the room for approximately twenty minutes until they led Defendant and Lucas in handcuffs to police cruisers parked in front of the hotel. (*Id.* at 45:28-47:48). Officer Hanzek then asked the manager to let him back into the hotel room to retrieve car keys for the rental car parked in the hotel parking lot (*Id.* at 50:00-51:42) and began going through the contents of the car (Ex. 2 - Hanzek 2 at 0:00-6:51). Officer Hanzek recovered an electronic key card to a U-Haul storage facility in the car. (*Id.* at 00:26). Law enforcement subsequently obtained search warrants for room 413, the rental car, and for U-Haul storage units.[2] (TR. 18; Filing No. 30 at p. 2; Filing No. 35 at pp. 2-4).

Defendant is now charged in the Indictment with one count of possession with intent to distribute five grams or more of actual methamphetamine and one count of possession of a document-making implement or authentication feature to produce false identification. (Filing No. 1). Defendant filed the instant motion to suppress on the basis that OPD officers' initial warrantless entry into room 413 violated her Fourth Amendment rights. Defendant asserts all

---

[2] The search warrants and affidavits were not offered as evidence, although Defendant does not challenge the warrants directly—she just argues the warrants are fruits of officers' initial unlawful entry into her hotel room.

statements and evidence obtained as a result of that initial warrantless entry—including evidence obtained pursuant to search warrants for the room, rental vehicle, and U-Haul storage units—are fruits of the initial Fourth Amendment violation. (Filing No. 30; TR. 17-19). The government contends that at the time officers entered room 413, Defendant no longer had a reasonable expectation of privacy in the premises because hotel management had decided to evict her from the room. Officers thereafter saw evidence of criminal activity in plain view inside the room, which provided probable cause for the search warrants. (TR. 19; Filing No. 35 at pp. 3-4).

## ANALYSIS

The Fourth Amendment provides that an individual has a right to be "secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" by the government. U.S. Const. amend. IV. This protection against warrantless intrusions "appl[ies] with equal force to a properly rented hotel room during the rental period." *United States v. Rambo*, 789 F.2d 1289, 1295 (8th Cir. 1986); see also *United States v. Molsbarger*, 551 F.3d 809, 811 (8th Cir. 2009) ("The Fourth Amendment protects individuals from warrantless searches in places where they have a reasonable expectation of privacy, a protection that may extend to a hotel room if certain factors are present.") (citation omitted). However, once a hotel guest "has been justifiably expelled, the guest is without standing to contest an officer's entry into [the guest's] hotel room on Fourth Amendment grounds . . . because, upon eviction, the rental period terminates and control over the hotel room reverts to management." *United States v. Peoples*, 854 F.3d 993, 996 (8th Cir. 2017) (cleaned up); see also *Molsbarger*, 551 F.3d at 811 ("Justifiable eviction terminates a hotel occupant's reasonable expectation of privacy in the room.") (citations omitted); *Rambo*, 789 F.2d at 1296 ("[A hotel guest] cannot assert an expectation of being free from police intrusion upon his solitude and privacy in a place from which he has been justifiably expelled").

"*Rambo* and subsequent cases make clear that the justification for such evictions may come from state statutes authorizing the removal of guests under certain circumstances." *United States v. Peoples*, 854 F.3d 993, 996 (8th Cir. 2017) (finding Missouri statute justified eviction from motel room for a reasonable belief the defendant was using the room for unlawful purposes); see also *United States v. Bohmont*, 413 Fed. Appx. 946, 950-51 (8th Cir. 2011) (unpublished) (per curiam) (concluding Missouri statute justified eviction from hotel due to hotel

4

security guard's reasonable belief there were illegal drugs in hotel room); *Rambo*, 789 F.2d at 1294 (holding Minnesota's undesirable guest statute justified officers' warrantless entry into hotel room to evict guest causing a disturbance). Unlike Missouri and Minnesota, Nebraska does not have a statute specifically addressing when hotel management may evict or remove a hotel guest. See *Young v. Harrison*, 284 F.3d 863, 867-68 (8th Cir. 2002) ("South Dakota does not have a statute governing hotel evictions and, therefore, reliance on *Rambo* is misplaced unless the officers can otherwise succeed in proving that [the] eviction was justified."). Nevertheless, the Eighth Circuit has found hotel management may justifiably evict a guest even in the absence of a state statute. For example, in *Young*, although South Dakota did not have a statute governing hotel evictions, the Eighth Circuit concluded a hotel guest "was justifiably evicted from the hotel because his friends created a disturbance," at which point "control over the hotel room reverted to the management." *Id.* at 869. As such, officers did not violate the Fourth Amendment when they entered the guest's hotel room because "when a hotel guest is properly evicted he loses the Fourth Amendment's protection against warrantless entry." *Id.* Similarly, in *Molsbarger*, the Eighth Circuit concluded a hotel manager justifiably evicted unruly guests despite no North Dakota statute authorizing the guests' removal. The hotel manager had called police about the unruly guests and confirmed to officers he wanted the guests evicted; "[t]he police justifiably entered the room to assist the manager in expelling the individuals in an orderly fashion." The Eighth Circuit concluded, "Any right [the defendant] had to be free of government intrusion into the room ended when the hotel manager, properly exercising his authority, decided to evict the unruly guests and asked the police to help him do so." *Molsbarger*, 551 F.3d at 811-12.

Moreover, the Eighth Circuit has held a hotel guest is "evicted" from a hotel room as soon as hotel management makes the decision to remove a guest from the room. In *Peoples*, for example, a police officer informed a motel clerk that one of the motel's guests was suspected of being involved in a car theft. In response, the motel clerk handed the officer a key to the guest's room so that the officer could evict the guest. *Peoples*, 854 F.3d at 995. The guest did not receive any notice that he was being evicted prior to the officer's entry into the room. The Eighth Circuit treated the guest as having lost his reasonable expectation of privacy in the room as soon as the motel clerk handed the officer the room key to effectuate the eviction. Therefore, the officer's entry into the hotel room "for the lawful purpose of effecting [the guest's] eviction"

5

was not a Fourth Amendment violation. *Id.* at 997; see also *Molsbarger*, 551 F.3d at 812 (finding police "justifiably entered the room to assist the manager in expelling the individuals in an orderly fashion" and no Fourth Amendment violation occurred upon such entry); *Bohmont*, 413 F. App'x at 951 (finding that at the time the officers forcibly entered a hotel room at the hotel security guard's request, the defendant had no reasonable expectation of privacy in the hotel room because hotel security had asked officers to evict the room's occupants—although the defendant was not explicitly told he had been evicted prior to the officers' entry into the room).

  In this case, the undersigned magistrate judge finds Defendant's eviction by Cambria Hotel management was justified, despite the absence of a Nebraska statute expressly governing hotel evictions. Here, the Cambria Hotel manager contacted police after a hotel guest reported that his wallet was stolen. The hotel manager watched the hotel's surveillance video footage showing Defendant stealing the wallet from the front check-in counter. The hotel manager recognized Defendant as a frequent hotel guest and remembered her because her card had been declined on a previous stay. Due to this blatant theft from another hotel guest, the hotel manager justifiably sought to end Defendant's stay at the hotel and to "ban and bar" Defendant from the premises. Once officers arrived at the hotel, the hotel manager explained he wanted Defendant banned and barred from the hotel, handed each officer ban and bar paperwork, and asked officers to escort Defendant off the property. True, Defendant was not necessarily an "unruly guest" causing the kind of disturbances that justified removal of guests in *Molsbarger* or *Young*, but certainly hotel management is justified in evicting guests who are caught on camera stealing from other guests, which is another type of disruptive, unauthorized behavior. See *Peoples*, 854 F.3d at 997 ("[J]ust because we have held that 'disruptive, unauthorized conduct in a hotel room invites intervention from management and termination of the rental agreement,' . . . it does not logically follow that there are not other circumstances in which the control over a room reverts to hotel management."). In order to effectuate Defendant's eviction, the hotel manager led OPD officers to room 413 and unlocked the door himself after knocking several times and announcing, "hotel management." OPD officers then entered room 413 for the primary purpose of evicting and banning and barring Defendant from the premises, although it is clear they were also looking for return of the stolen wallet, evidenced by their statements to Defendant, questionable tone and language, and immediate rifling through the bags and personal items in the room. But, because hotel management justifiably evicted Defendant due to her recorded theft,

6

her reasonable expectation of privacy in room 413 ended and the room immediately reverted to management upon the hotel's decision to evict her. See *Rambo*, 789 F.2d at 1295-96; *Molsbarger*, 551 F.3d at 812. Therefore, OPD officers justifiably entered room 413 at the manager's request for the lawful purpose of effecting Defendant's eviction, which did not violate the Fourth Amendment. And inside room 413, OPD officers observed evidence of criminal activity (suspected methamphetamine and a pipe) in plain view on a table.

Defendant's motion seeks suppression solely on the basis that all evidence and statements in this case were fruit of OPD officers' initial warrantless entry into room 413. Because the undersigned magistrate judge finds the initial warrantless entry into the hotel room did not violate the Fourth Amendment, Defendant's motion to suppress should be denied. Upon consideration,

**IT IS HEREBY RECOMMENDED** to the Honorable Robert F. Rossiter, Jr., Chief United States District Court Judge, that Defendant's Motion to Suppress (Filing No. 29) be denied.

Dated this 28th day of September, 2022.

BY THE COURT:

s/ Michael D. Nelson
United States Magistrate Judge

**ADMONITION**

Pursuant to NECrimR. 59.2, any objection to this Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.